Dear Ms. Landrieu and Members of the State Bond Commission:
As you know, after the passage of Act 813 and Act 1044, I received several requests for opinions concerning the State's debt limitation laws. In particular, I received requests from the State Bond Commission (the "Commission") regarding the application of the debt limitation provisions to particular bond issues, for example, the borrowing by the Louisiana Insurance Guaranty Association, the proposed borrowing by the Louisiana Health Insurance Guaranty Association and the Jena-LaSalle juvenile detention facility to name but a few. Many different people, including bond counsel, legislators and their staff, and Commission members and staff, had different interpretations of what was in and out of the debt limit.
I recognized that to deal with interpretations of the debt limitation laws on a project by project basis could result in inconsistent application of the statute by the Commission and other governmental entities who must apply the debt limit law. I then formed a Task Force in the hope of suggesting an appropriate course of action for the Commission to follow. The purpose of the Task Force was to bring together public officials and private citizens who are knowledgeable on the subject and who could assist me in developing a body of information or guidelines in trying to apply or interpret the Constitution and statute.
Members of the Task Force included representatives of the Governor's Office, the Commission, the Commissioner of Administration, the House of Representatives, the Senate and State bond counsel, as well as a designee from my office.
The Task Force met numerous times and engaged in a very active exchange of issues and ideas. What was most clear from all the meetings is that there is a considerable divergence of opinion in interpreting the statute and constitution. For example, arguments were made that legislative intent should be examined in order to interpret the statute; others argued that the key elements of the language were not vague and therefore under well established rules of statutory interpretation, legislative intent could not be examined. The Task Force developed a worksheet listing different types of bond issues with various types of security. After much discussion, they were able to reach a unanimous decision on the inclusion or exclusion from the debt limit of all but three of the bond issues listed on the worksheet. I appreciate the Task Force members agreeing to serve as well as all of the hard work, effort and time they gave to serving on the Task Force.
I have reviewed the Constitution, statutes and jurisprudence on the matters dealt with by the Task Force and find the majority of their conclusions are well founded and legally correct. However, I must emphasize that I do not issue opinions on the basis of what is the consensus of a group or what is the most popular answer. The opinions of my office are issued only after thorough research of the Constitution, law and jurisprudence on the subject and after due deliberation, so that the opinion is, I believe, legally correct.
The Constitutional Provision
Act 1044, approved by the voters on October 16, 1993, amended Article VII, Section 6 (F). Act 1044 mandates the legislature to determine a limit on the amount of net state tax supported debt which may be issued by the State in any fiscal year. Net state tax supported debt shall be defined by law, which once enacted, cannot be changed except by a two-thirds vote of the elected members of each house of the legislature.
The limitation must be established so that by Fiscal Year 2003-2004 and thereafter the amount necessary to service outstanding net state tax supported debt shall not exceed six percent of the estimate of money to be received by the state general fund and dedicated funds contained in the official forecast adopted by the Revenue Estimating Conference at its first meeting after the beginning of each fiscal year. The limitation shall not be construed to prevent the payment of debt service on net state tax supported debt. Debt service includes payments of principal, interest and sinking fund requirements. The limitation can be changed or exceeded by a two-thirds vote of the elected members of each house of the legislature. The constitutional provision prohibits the Commission from approving the issuance of any net state tax supported debt, the debt service requirement of which would cause the limit to be exceeded.
The Statutory Provision
Act 813, effective July 1, 1993 enacts La. R.S. 39:1367 as the legislative determination of the limit of net state tax supported debt. Act 813 sets a limitation on the issuance of net state tax supported debt and prohibits the issuance of such debt if the amount to be expended for principal, interest and sinking fund requirements on such debt exceeds a specified percentage of the estimate of money to be received by the state general fund and dedicated funds for each respective fiscal year as contained in the official forecast adopted by the Revenue Estimating Conference at its first meeting of each fiscal year. The percentage, beginning with 13.1% for Fiscal Year 1993-94, is reduced each year until Fiscal Year 2003-2004, when the percentage reaches the constitutional mandate of 6.0%.
The limitation may be changed or exceeded for a particular project or related projects upon passage of a specific legislative instrument by two-thirds vote of the elected members of each house of the legislature. [La. R.S. 39:1367 (B)(1) and (2)]. The Commission is prohibited from approving the issuance of any net state tax supported debt, the debt service requirement of which would cause the limit to be exceeded. [La. R.S. 39:1367
(D)].
Most of the questions concerning the debt limitation are based upon the language in Section E of La. R.S. 39:1367 which defines "net state tax supported debt" as follows:
 "(E) As used in this Section, the following terms shall have the following meanings ascribed to them unless the context clearly indicates otherwise:
 (2) `Net state tax supported debt' means all of the following debt obligations issued by the state or any entity in the state for which the state is legally obligated to make debt service payments, either directly or indirectly:
 (a) General obligation bonds secured by the full faith and credit of the state.
 (b) Debt secured by capital leases of immovable property payable by the state or annual appropriations of the state.
 (c) Debt secured by statewide tax revenues or statewide special assessments.
 (d) Debt secured by self-supported revenues which in the first instance may not be sufficient to pay debt service and will then draw on the full faith and credit of the state.
 (3) `Net state tax supported debt' shall not mean (i) any obligations owed by the state pursuant to the State Employment Security Law, or (ii) cash flow borrowings payable from revenue attributable to one fiscal year."
General Rules of Statutory Interpretation
Our Civil Code and Revised Statutes set forth some general rules of statutory interpretation, as follows:
 C.C. art. 9: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."
 C.C. art. 10: "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law."
 C.C. art. 11: "The words of a law must be given their generally prevailing meaning.
 Words of art and technical terms must be given their technical meaning when the law involves a technical matter."
 C.C. art. 12: "When the words of a law are ambiguous, their meaning must be sought be examining the context in which they occur and the text of the law as a whole."
 C.C. art. 13: "Laws on the same subject matter must be interpreted in reference to each other."
 La. R.S. 1:3: "Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.
 The word `shall' is mandatory and the word `may' is permissive."
 La. R.S. 1:4: "When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit."
Issues
1. When is the use of "legislative intent" appropriate in the construction of a statute? Is it appropriate in the case of the debt limitation statute?
As quoted above, C.C. art. 9 states: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. R.S. 1:4 further provides: "When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." Our jurisprudence is consistent with these provisions. Following are selected quotations from various cases:
Webb v. Dept. of Public Safety Corr., 579 So.2d 1243
(La.App. 3rd Cir. 1991):
 It is not appropriate for this court to look to the intent of the legislature unless the statute is ambiguous or leads to an absurd result. As was stated in Rada v. Administrator, Div. of Emp. Sec., State, D. of L., 319 So.2d 460, 463
(La.App. 4th Cir.), writ refused, 323 So.2d 128
(La. 1975): "Furthermore, if . . . the legislature erred in expressing its intention, it is not the function of the judicial branch to correct such an error, unless the error creates an ambiguity. Such an error (if one occurred) should be corrected by the legislature."
State Dept. of Social Services v. Parker, 595 So.2d 815
(La.App. 2d Cir. 1992):
 The paramount consideration in a case involving statutory interpretation is determining the legislative intent. Turner v. City of Shreveport, 437 So.2d 961 (La.App. 2d Cir. 1983). Courts should construe statutes to give them the meaning intended by the legislature and to avoid absurd results. Lopez v. City of Shreveport, 449 So.2d 1184 (La.App. 2d Cir. 1984).
 Statutes should be given a genuine construction in accordance with the fair import of words taken in their usual sense in connection with context. State v. Hudnall, 480 So.2d 933 (La.App. 2d Cir. 1985). Nevertheless, when a statute contains latent ambiguities despite superficial clarity, an appellate court may turn to the statute's legislative history for guidance. West v. Kerr-McGee Corporation, 765 F.2d 526 (5th Cir. 1985). Moreover, judicial construction must aim to attribute reasonable meaning to an entire statutory framework and context. Johnston v. Morehouse Parish Police Jury, 424 So.2d 1053
(La.App. 2d Cir. 1982).
Third District Land Co., Limited, v. Toka et al.,170 So. 793 (La.App. Orl. 1936):
 The intention of the legislature to which effect must be given is that expressed in the statute, and the court will not inquire into the motives which influenced the legislature, or individual members, in voting for its passage; nor indeed as to the intention of the draftsman, or of the legislature, so far as it has not been expressed in the act. So, in ascertaining the meaning of a statute, the court will not be governed or influenced by the views or opinions of any or all of the members of the legislature or its legislative committees, or of any other persons." Corpus Juris, Verbo "Statutes", vol. 59, p. 1017."
Therefore, it is only appropriate to determine what was the legislative intent of a certain act, if the act is vague and ambiguous. In my opinion, these Acts are not vague and ambiguous, therefore, it would not be proper for this office to seek to determine the legislative intent concerning Act 813 and 1044.
2. The Constitutional provision refers to debt "issued by the state", La. R.S. 39:1367 refers to debt "issued by the state or any entity in the state for which the state is legally obligated . . ." Is the statute impermissibly broader than the constitutional provision because it contemplates net state tax supported debt could be issued by an entity other than the state?
In Polk v. Edwards, 626 So.2d 1128 (La. 1993), our Supreme Court discussed at length the principles of statutory construction in constitutional law stating in pertinent part as follows:
 An elementary principle of statutory construction in constitutional law holds that all statutory enactments are presumed to be constitutional. Interstate Oil Pipe Line Co. v. Guilbeau, 217 La. 160, 46 So.2d 113 (1950); State on behalf of J.A.V., 558 So.2d 214 (La. 1990). Unless the fundamental rights or privileges of a person are involved, a strong presumption exists that the legislature in adopting legislation has acted within its constitutional authority. Board of Directors of Louisiana Recovery Dist. v. All Taxpayers, Property Owners, etc., 529 So.2d 384 (La. 1988).
 This presumption is especially forceful in the case of statutes enacted to promote a public purpose, such as statutes relating to public finance. . .
 . . . Thus, in order to hold legislation invalid under the constitution, it is necessary to rely on some particular constitutional provision that limits the power of the legislature. (citations omitted)
 . . . Accordingly, in an attack upon a legislative act as falling within an exception to the legislature's otherwise plenary power, an opponent must establish more than that the constitutionality of the legislation is fairly debatable. The opponent must establish clearly and convincingly that the constitutional aim was to deny to the legislature the power to enact the legislation.
As stated above, Article VII, Section 6 (F) provides that the legislature shall provide for the determination of a limit to the amount of net state tax supported debt which may be issued by the state. R.S. 39:1367 seeks to broaden the constitution to include within the debt limit not only debt issued by the State but also to include debt issued by "any entity in the state for which the state is legally obligated to make debt service payments, either indirectly or indirectly". Later in this opinion, I will discuss the concepts of whether the State is or can be legally obligated to make debt service payments for any other entity as well as the concept of the State's indirect liability; however, for purposes of this issue, it appears that R.S. 39:1367 is subject to constitutional challenge to the extent that it purports to broaden the language of the Constitution to include within the State's debt limit, debt which is issued by an entity in the State other than the State itself.
It must be emphasized that the objectionable language contained in R.S. 39:1367 can in no way be construed to broaden what are legally debts of the State. There is a distinction between a debt of the State legally and what is a debt of the State for purposes of the debt limit calculation. While R.S.39:1367 creates categories of debt for purposes of the calculation, it does not and cannot cause obligations which fit within the categories to be debt of the State if such is not otherwise debt of the State as provided by the Louisiana Constitution.
3. What is the definition of "debt obligation"?
As quoted above, La. R.S. 39:1367 (E)(2) defines "net state tax supported debt" to mean certain enumerated "debt obligations". While the term "debt obligation" is not specifically defined in the Constitution or statutes, the term is used in the 1974 Louisiana Constitution, Art. VI, Sec. 35, Art. VI, Sec. 37, Art. VII, Sec. 22 and Art. XIV, Sec. 25. Furthermore, R.S. 39:1011 indicates that the term includes bonds, notes and certificates of indebtedness.
It is the opinion of this office that for purposes of the debt limit calculation, a "debt obligation" must mean a bond, note, certificate of indebtedness or other written obligation for the repayment of borrowed money.
4. Is the list of debt obligations contained in Section (E)(2)(1) through (4) exclusive or illustrative?
As quoted above, Section (E)(2) provides that net state tax supported debt "means all of the following debt obligations" followed by four categories. The only case found interpreting a clause similar to "means all of the following" is National Wildlife Federation, et al. v. Gorsuch, 693 F.2d 156 (C.A. D.C. 1982) in which the court stated:
 Congress used restrictive phrasing — "[t]he term `pollutant' means dredged spoil, [etc.]" — rather than the looser phrase "includes," used elsewhere in the Act. As a general rule, "`[a] definition which declares what a term "means" . . . excludes any meaning that is not stated."' Colautti v. Franklin, 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 684 n. 10, 58 L.Ed.2d 596
(1979) (quoting C. Sands, Statutes and Statutory Constructions 47.07 (4th ed. Supp. 1982)). (Emphasis supplied)
Based upon this case, it is the opinion of this office that the list of "debt obligations" set forth in R.S. 39:1367 (E)(2) is exclusive and not illustrative.
5. Must the first subsection (2) of Section (E) be satisfied before inquiring as to the four specific transactions set forth in (a) through (d)? Or is the first subsection (2) to be "tagged" on to the four specific transactions?
Laws must be construed as a whole, and each part must be given effect where such result can be reasonably achieved; it cannot be presumed that meaningless clauses and phrases were enacted. Pickering v. City of Baton Rouge, 442 So.2d 522
(La.App. 1st Cir. 1983). An act as a whole is to be so interpreted if possible that no clause, sentence or word shall be superfluous or meaningless. CHF Finance Co. v. Jochum, 241 La. 155, 127 So.2d 534
(1961). Meaning should be given, if possible, to every section of a statute; no portion of law should be so construed as to render another inoperative. Fisher v. Albany Machine Supply Co., 246 So.2d 218 (La.App. 1st Cir. 1971), writ issued248 So.2d 332, 258 La. 905, affirmed in part, reversed in part260 So.2d 691, 261 La. 747.
Every part of R.S. 39:1367 must be given legal effect, if at all possible; therefore, if an issuance does not fall within the parameters of Section (E) before the listing (a) through (d), the issue cannot be considered to be within the debt limitation. Thus, it is the opinion of this office that the requirements set forth in the preamble to Section (E)(2) must be satisfied in order for a debt obligation to be included in the debt limit.
6. Barring a separate guaranty by a tenant, is a tenant [the state] ". . . legally obligated to make debt service payments. . .", if the tenant's lease is pledged to secure the owner/landlord's debt? Or is a tenant only "legally obligated" to pay rent, which rents may be assigned or transferred by the owner/landlord to its lender? Regardless, is the payment by the tenant always classified as "rent"?
There is only one reported Louisiana decision on the definition of "legally obligated". That decision is Terrebonne v. State Farm Fire and Casualty Co., 491 So.2d 73 (La.App. 1st Cir. 1986) regarding a provision in an insurance contract which stated the insurance company would pay all sums "for which the insured shall become legally obligated". The court stated:
 The clause in question is clear and explicit. (footnote omitted). The generally prevailing meaning of legally obligated or a legal obligation is defined as "[a] duty imposed by law. . . .", Black's Law Dictionary, 806 (5th ed. 1979). It is axiomatic that in this state, in regard to personal injuries, there is no duty imposed by law without some type of legal fault. La.C.C. art. 2315.
The duties of a lessee are primarily set forth in the Civil Code. A lessee is bound to enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease and to pay the rent at the terms agreed on. C.C. art. 2710. If the lessee fails to pay the rent when it becomes due, the lessee can be evicted. C.C. art. 2711.
The lessor, and not the lessee, unless there be a stipulation to the contrary, must bear all the real charges with which the thing leased is burdened. Thus he has to pay the taxes, rents and other dues imposed upon the thing leased. C.C. art. 2702.
"Rent" is compensation for the use and enjoyment of the thing rented, and is ordinarily demandable whether tenant actually enjoys the use and possession of the subject of the rent or not. Shepard Realty Co. v. United Shoes Stores Co., 193 La. 211,190 So. 383 (1939).
While the lessor has the right to assign the rentals he is to receive under a lease to his creditors, such an assignment does not change the nature of the obligation of the lessee towards the creditor; the lessee still only has the obligation to pay the rent, while the creditor has the right to collect the rent. See Coyle v. Geoghegan, 187 La. 308, 174 So. 366 (1937).
Barring a separate guaranty or other agreement by a tenant, a tenant is only legally obligated to pay rent, and is not legally obligated to pay a debt service payment of the landlord or fulfull [fulfill] a debt service obligation, if the landlord has pledged the tenant's lease or assigned the rentals thereunder to secure the landlord's debt.
7. Can a person be "indirectly" liable for another person's debt service payments? Does Louisiana have a concept of "indirect" liability?
Neither the Civil Code nor the Revised Statutes refer to indirect liability of a person or entity. Only two Louisiana cases mention the term "indirect liability", neither of which are pertinent to this opinion. [Poche v. Avondale Shipyards, Inc.,329 So.2d 211 (La.App. 4th Cir. 1976) used the term in a footnote quoting the 1972 U.S. Code Cong. Admin. News which used the term in relation to a proposed amendment to the Longshoremen's and Harbor Workers' Compensation Act; and Bourque v. Lehmann Lathe, Inc., etc., 476 So.2d 1125 (La.App. 3d Cir. 1985), a products liability case wherein the plaintiff alleged that a purchaser of equipment manufactured by a bankrupt was liable for plaintiff's injuries from the equipment alleging that the purchaser was a successor business. In neither case did the court recognize that a person was indirectly liable.]
An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance may consist of giving, doing, or not doing something. C.C. art. 1756. (Emphasis supplied) Obligations arise from contracts and other declarations of will. They also arise directly from the law, regardless of a declaration of will, in instances such as wrongful acts, the management of the affairs of another, unjust enrichment and other acts or facts. C.C. art. 1757.
While an obligor and a third person may agree to an assumption by the latter of an obligation of the former, the agreement must be in writing in order for it to be enforceable by the obligee against the third person. C.C. art. 1821.
There can be no question that prior to the enactment of La. R.S. 39:1367 (E)(2), there was no concept of indirect liability in Louisiana law. The words "indirectly liable" are used in La. R.S. 39:1367 (E)(2), and must be given effect, if at all possible (see discussion under issue number 4 herein). The question that then arises is, whether the use of these words creates a new concept of indirect liability? If so, how could the State be indirectly yet legally liable to make a debt service payment for another entity? If the State were to contractually agree to pay debt service for another entity or if the legislature directed the Treasurer, on behalf of the State, to use monies within the State treasury for the payment of another entity's debt service (assuming either hypothet is legal), the State would be directly liable to make such payments. While monies expended by the State may be used by the recipient to make debt service payments, and thus there is an indirect debt service payment, such does not create a legal obligation of the State to make the debt service payment.
It is the opinion of this office that the State cannot be legally obligated to make an "indirect" debt service payment for another entity. If the State is legally obligated to make a debt service payment, such obligation would have to be a "direct" obligation of the State.
8. What is the legal definition of a "capital lease"?
"Capital lease" is a term used by accountants and is therefore a technical term. C.C. art 11 provides that "words of art and technical terms must be given their technical meaning when the law involves a technical matter." Accountants determine whether a lease is an operating lease or a capital lease pursuant to the Financial Accounting Standards Board (FASB) Statement No. 13.
The very few reported decisions in the United States which discuss or define "capital lease" refer to FASB 13. In Yost v. Early, 87 Md. App. 364, 589 A.2d 1291 (Maryland Court of Special Appeals, 1991), cert. den., the court in a footnote stated that the lower court had determined that the definition of an operating lease was a lease that (i) is for a term which does not exceed 75% of the expected useful life of the leased item and (ii) pays out less than 90% of the leased item's cost. A capital lease was defined as a lease that pays out more than 90% of the cost of the leased item. The court referred to FASB 13.
In United States v. Archer-Daniels-Midland Co.,584 F. Supp. 1134 (S.D. Iowa 1984) the court stated as follows in pertinent part:
 The accounting firms of Ernst Whinney and Coopers Lybrand, in reaching their opinions that the Nabisco-ADM lease is an operating lease rather than a capital lease, measured the lease under the Financial Accounting Standards Board (FASB) Statement No. 13. Under FASB Statement No. 13, paragraph 7, if at its inception a lease meets one or more of items a. through d. and both e. and f. below, a lessor should account for a lease as a capital lease. (The accounts found that the Nabisco-ADM lease did not meet any of items a. through d.)
 a. The lease transfers ownership of the property to the lessee by the end of the lease term.
 b. The lease contains a bargain purchase option.
 c. The lease term is equal to 75% or more of the estimated economic life of the leased property.
 d. The present value at the beginning of the lease term of the minimum lease payments equals or exceeds 90% of the fair value of the leased property to the lessor.
 e. Collectibility of the minimum lease payments is reasonably predictable.
 f. No important uncertainties surround the amount of unreimbursable costs yet to be incurred by the lessor under the lease.
 Thus, a capital lease appears to be the functional equivalent of an installment sales transaction — a sale in lease clothing.
 An operating lease is one that does not meet the above criteria. An operating lease expires at a point in time well before the end of the useful life of the leased assets. If an operating lease includes an option to buy, the purchase price is an amount closely approximating the fair market value of the assets at the time of the purchase, whether the option is exercised at the end of the lease or any earlier date. Accordingly, unlike a capital lease, the rental payments are not substantially the same as periodic payments under an installment sales contract, and the transaction is not the functional equivalent of an installment sale of the leased assets.
In United States v. Archer-Daniels-Midland Co., et al.,781 F. Supp. 1400 (S.D. Iowa 1991) the court found that the lease at issue was an operating lease as distinct from a capital lease which is tantamount to an installment purchase arrangement.
It is the opinion of this office that for purposes of the debt limit calculation, "capital lease" means an installment purchase arrangement. However, from this statement it cannot be concluded that it is the opinion of this office that the legislature has by using the term adopted FASB 13. It is specifically prohibited by our Constitution to adopt a system or code of laws by general reference to it. The bill must completely set forth the provisions of the law being enacted, amended or revived. Art. III, Sec. 15 La. Const. See Rathborne v. Collector of Revenue, 196 La. 795, 200 So. 149 (La. 1941).
9. Does capital leases on immovable property ". . . payable by the state. . ." exclude or exempt capital leases of immovable property payable by state agencies or political subdivisions?
In Stokes v. Harrison, 238 La. 343, 115 So.2d 373 (La. 1959), the Supreme Court had to determine the meaning of the word "State" for purposes of Art. IV, Sec. 2 of the 1921 Louisiana Constitution which ordered the State to reserve the mineral rights on any and all property sold by it. The court stated in pertinent part:
 * * * When the Constitution speaks of a state, and inhibits the doing of certain things, it sometimes includes under the term `state' every instrumentality or agency of the state which presumes to act by authority of the state, and in other cases the action of the state in its sovereign or legislative character is alone referred to. * * *" Karem v. United States, 6 Cir., 121 F. 250, 256, 61 L.R.A. 437.
 Since the word "State" may include every instrumentality of the state or may be limited in its scope,
 "The safest rule of interpretation is to look to the nature and object of the particular powers, duties and rights with all the lights and aid of contemporaneous history, and to give to the words such operation and force consistent with their legitimate purposes as may fairly secure and attain the ends proposed. (citations omitted).
In Long v. Northeast Soil Conservation District of La.,72 So.2d 543 (La.App. 2d Cir. 1954), a case dealing with sovereign immunity, the court stated:
 The State, which is the sovereign power under our theory of government, comprehends and includes administrative departments and agencies, and, as is so clearly and concisely pointed out in the above quotations, the freedom of the sovereign from suit without its consent must be extended to the administrative departments and agencies by and through which the sovereign state performs its governmental functions.
In State v. Ward, 314 So.2d 383 (La.App. 3d Cir. 1975), the court cited the Long case for the proposition that "our jurisprudence holds that the State includes administrative departments and agencies within the State government."
It is the opinion of this office that when the word "State" is used in La. R.S. 39:1367 (E)(2)(b), it must include state administrative departments and agencies, but should not include political subdivisions of the State.
10. If the owner/landlord does not make "debt service payments" because there is no debt attributable to the immovable, does the statute apply? If not, why the distinction between a state lease on unencumbered property and a state lease on encumbered property?
As stated in the discussion on question number 2, in order for the statute to apply there must be a "debt obligation" which is defined to include a "bond, note, certificate of indebtedness or other written obligation for the repayment of borrowed money". If there is no debt obligation involved, the debt limit statute is irrelevant to the transaction.
11. Section (E)(2)(b) sets forth the category of "debt secured by capital leases of immovable property payable by the state or annual appropriations of the state". What are the rules for the construction of disjunctives separated by the word "or"?
The question becomes how should the disjunctive "or" be interpreted. The phrase could be read to mean "debt secured by capital leases of immovable property payable by (i) the State OR (ii) annual appropriation of the State? Under this analysis, Section (E)(2)(b) is limited to those capital leases of immovable property where the State is a tenant OR another entity is the tenant and receives an appropriation of the State which is used to pay that entity's rent obligation.
Section (E)(2)(b) could also be read that it applies to debt secured by (i) capital lease of immovable property payable by the State OR (ii) annual appropriation of the State. Under this interpretation, any debt, including debt affecting movable property, in which a State appropriation is used to make a debt service payment would be included in the debt limit calculation.
As to the rules of construction for the word "or", La. R.S.1:9 states: "Unless it is otherwise clearly indicated by the context, whenever the term `or' is used in the Revised Statutes, it is used in the disjunctive and does not mean `and/or'."
In State of La. ex rel. Board of Commissioners of the Lake Borgne Basin Levee District v. Bergeron, 235 La. 879, 106 So.2d 295
(La. 1958) the court cited R.S. 1:9, C.J.S. and then stated:
 In the case of Bradford v. Louisiana Public Service Commission, 189 La. 327, 179 So. 442, we recognized that though "and" and "or" are ordinarily not interchangeable but strictly of a conjunctive and disjunctive nature respectively, "and" may be construed to mean "or" to effectuate the intention of parties or a Legislature, particularly where the context favors such construction and a contrary construction would render the meaning ambiguous or result in absurdity.
 Ordinarily the word "or" is a disjunctive particle suggesting an alternative either "this" or "that", depending upon the words with which it is used; and, while in its strict signification the term suggests an alternative, it may be used or construed in a conjunctive sense. Courts generally have held that although the word "or" may express a disjunctive meaning rather than a conjunctive one, it may nevertheless be used in a conjunctive sense and hence may be construed to mean "and".
 We are mindful of the fundamental rule that in the construction of statutes the grammatical sense of words is to be adhered to. If that is contrary to or inconsistent with any expressed intention or any declared purpose of the statute, or if it would involve an absurdity, repugnance or inconsistency in its different provision, the grammatical sense must then be modified, extended or abridged, so far as to avoid such.
 The popular use of "or" and "and" is so loose and so frequently inaccurate that it has infected statutory enactments. While they are not treated as interchangeable, and should be followed when their accurate reading does not render the sense dubious, their strict meaning is more readily departed from than that of other words, and one read in place of the other in deference to the meaning of the contest. Sutherland on Statutory Construction, Sec. 252.
State v. Lattier, 377 So.2d 450 (La.App. 2d Cir. 1979) quoted State v. Bergeron for the proposition that in civil cases "and" may sometimes mean "or" and vice versa.
Reading Section (E)(2)(b) to mean that all debt secured by annual appropriation of the State is included in the debt limit calculation, would cause capital leases of movables to be included in the calculation. The State's Comprehensive Annual Financial Report for the year ending June 30, 1993, places this number at $54,339,000 including principal, interest and executory costs (page 54). If the legislature had desired that all debt subject to appropriation of the State be included within the debt limit calculation, it would not have had to add the language to Section (E)(2)(b) "capital leases of immovable property" because any multi-year lease of property entered into by the State or a State agency pursuant to the Procurement Code, must contain a non-appropriation clause. La. R.S. 39:1615. In other words, capital leases of immovable property are subject to annual appropriation of the legislature. Based upon the foregoing, it is the opinion of this office that Section (E)(2)(b) must be read as mean "debt secured by capital leases of immovable property payable by (i) the State OR (ii) annual appropriation of the State."
I will now turn to the Work Sheet developed by the Task Force, stating the issue, the Task Force conclusion, and my opinion on each type of bond issue.
12. General obligation bonds of the State payable from the Bond Security and Redemption Fund.
The Task Force concluded, and I concur, that such bonds are included in the debt limit. Such bonds are debt obligations issued by the State and are specifically included in Section (2)(a).
13. Revenue bonds issued by the State or a State agency pursuant to Article VII, Section 6 (C) of the Constitution which are payable from fees, rates, rentals, tolls, charges, grants or other receipts or income derived by or in connection with an undertaking, facility, project or any combination thereof.
The Task Force concluded, and I agree, that such revenue bonds are not included in the debt limit because of Article VII, Section 6 (C) of the Louisiana Constitution which authorizes state board, agencies and commissions to issue bonds secured by fees, rates, rentals, tolls, charges, grants or other receipts or income derived by or in connection with an undertaking, facility or project. Article VII, Section 6 (C) further states in pertinent part: "[i]f issued other than as provided in Paragraphs (A) and (B), such revenue bonds shall not carry the pledge of the full faith and credit of the state and the issuance of the bonds shall not constitute the incurring of state debt under this constitution." (Emphasis supplied)
14. Revenue bonds which are also secured by the full faith and credit of the State.
The Task Force decided, and I agree, that such bonds are included in the debt limit. Such bonds would be debt obligations of the State as they could only be issued if the bonds are authorized by a two-thirds vote of each house of the legislature and only if the proceeds were to be used to "repel invasion; suppress insurrection; provide relief from natural catastrophes; refund outstanding indebtedness at the same or a lower effective interest rate; or make capital improvements" in accordance with a capital budget [Article VII, Section 6 (A)]. This type of bond would be included within the debt limit under Sections (2)(a) and (2)(d).
15. Revenue bonds issued by a conduit issuer to fund a project, secured by lease payments from the State or a state agency, board or commission as lessee — the project is a lease of immovable property.
As the terms and conditions of the lease are not stated, it is not possible to determine whether the bonds would fall within Subsections (a) through (d) of Section 2; however, in order for such bonds to be included in the debt limit, the conditions set forth in the preamble to Section 2 must be satisfied, namely, the State must be legally obligated to make debt service payments on the bonds. As discussed under number 6 herein, a lessee is only liable for the payment of rent unless the lessee were to specifically agree to assume additional obligations.
16. Revenue bonds issued by a conduit issuer to fund a project, secured by lease payments from the State or a state agency, board or commission as lessee — the project is a lease of movable property.
The Task Force determined, and I agree, that this issue would not be included within the debt limit because the issue does not fit within Section (2)(b). of course, this is conclusion is unnecessary if the conditions set forth in the preamble to Section 2 are not satisfied (see discussion under number 15).
17. Revenue bonds issued by a conduit issuer to fund a project, secured by lease payments from the State or a state agency, board or commission as lessee — the project is a lease with an option to purchase for a nominal amount.
The Task Force was unable to reach a consensus on this issue. The disagreement among the Task Force members was not whether this lease is a capital lease under FASB 13, which it clearly is, but rather whether in this scenario the conditions set forth in the preamble to Section (2) are satisfied.
As stated earlier, the State, acting purely as a lessee, is only obligated to pay rent to its lessor. The mere fact that a lessor may issue its own debt and secure that debt with the revenue stream generated by a lease of space to the State, does not cause the State to be liable for the payment of debt service unless the State assumes that additional obligation.
Assuming that the State has not obligated itself to do anything other than pay lease payments in the lease, it is the opinion of this office that the conditions set forth in the preamble to Section (2) are not met, and this debt would not be subject to the debt limit even though a capital lease is involved.
18. Revenue bonds issued by a conduit issuer to fund a project, secured by lease payments from the State or a state agency, board or commission as lessee — the project is a lease with an option to purchase for a fair market price.
The Task Force decided that this issue is not included in the debt limit, and I agree. This arrangement is not a financing or capital lease even if the conditions in the preamble to Section 2 could be satisfied.
19. Revenue bonds issued by a conduit issuer to fund a project, secured by lease payments from the State or a state agency, board or commission as lessee — the project is a lease without an option to purchase, but the lease term is shorter than the useful life of the facility.
The Task Force concluded that this is not within the debt limit, and I agree, for the same reason as set forth under number 18. This arrangement is not a capital lease and the bond issue does not meet any other subsection of Section (2) even if it could be found that the conditions of the preamble to Section (2) could be satisfied.
20. Revenue bonds issued by a conduit issuer to fund a project, secured by lease payments from the State or a state agency, board or commission as lessee — the project is a lease without an option to purchase, but the lease term is longer than the useful life of the facility.
This is another scenario that the Task Force could not agree upon. It was agreed that the lease would be a capital lease under FASB 13; however, the disagreement was with regards to the preamble to Section (2).
For the same reasons as set forth under number 17, it is the opinion of this office that this debt would not be included within the State's debt limit calculation.
21. Bonds issued by a conduit issuer which are secured by a guarantee, cooperative endeavor, per diem, take or pay contract or other obligation of the State (except for a lease) which is subject to annual appropriation by the Legislature.
The Task Force decided that this question actually contains several different scenarios, each of which must be addressed separately.
The Task Force believed that guarantees are contingent obligations, and the determination of whether a guarantee is in or out of the cap should only be made when the guarantee is actually exercised. I agree with that analysis. To determine if a guarantee is or is not included in the cap must be done on a case by case basis, depending upon the nature of the obligation being guaranteed and after a reasonable determination is made of the likelihood of the guarantee being enforced against the State.
The term "cooperative endeavor" is very broad and vague. In order to determine whether the terms of a cooperative endeavor would cause the transaction to be included within the debt limit must be made on a case by case basis.
The Task Force decided and I agree that an arrangement calling for a true per diem or true take-or-pay, would not, in itself be included within the debt limit calculation. However, if the per diem or take-or-pay was actually a disguised capital lease, looking at the terms of the actual arrangement, it could be included within the debt limit calculation assuming that the conditions in the preamble to Section (2) are satisfied.
22. Bonds issued by the State or an agency thereof without a pledge of the full faith and credit of the State but with the pledge of a special statewide tax or special assessment.
The Task Force agreed, and I concur, that such a bond issue is specifically included in the debt limit by virtue of Section 2 (c).
23. Bonds issued by the State or an agency thereof without a pledge of the full faith and credit of the State but with the pledge of a special state tax or assessment which is less than statewide.
The Task Force concluded, and I agree, that such a bond issue is not included in the debt limit because Section (2)(c) requires the tax or special assessment to be statewide.
24. Bonds issued by a local political subdivision of the State, which is a single parish or sub-parish, secured with a pledge of a tax levied by the political subdivision or other funds of the political subdivision.
The Task Force decided, and I agree, that this would not be included within the debt limit because the debt involved would clearly not be debt of the State.
25. Bonds issued by a local political subdivision of the State, which is multi-parish, secured with a pledge of a tax levied by the political subdivision or other funds of the political subdivision.
For the same reason as number 24, namely that the debt at issue is clearly local debt and not debt of the State, the Task Force decided and I agree that this bond issue is not within the debt limit calculation.
26. Bonds issued by a local political subdivision of the State, which is statewide, secured with a pledge of a tax levied by the political subdivision or other funds of the political subdivision.
The Task Force determined, and I agree, that this is not included in the debt limit because the State is not legally obligated to pay the debt service on the bonds.
27. Refunding bonds.
The Task Force decided and I agree, that refunding bonds may or may not be included in the debt limitation depending upon whether the bonds would otherwise be included under Section (2). It must be noted that even if the refunding bonds are included, the bonds being refunded would not be included in the debt limit because once the bonds are legally defeased, the refunded bonds are considered paid and no longer outstanding. La. R.S. 39:1442.
28. Tax anticipation notes.
The Task Force decided, and I agree, that tax anticipation notes are not included in the debt limit because tax anticipation notes are secured essentially in the same manner as revenue anticipation notes, which are specifically excluded from the debt limit by Section (3).
29. Revenue anticipation notes.
The Task Force agreed, and I concur, that revenue anticipation notes are not within the debt limit because of the exclusion in Section 3.
30. Bond anticipation notes.
The Task Force decided, and I agree, that bond anticipation notes may or may not be included in the debt limit depending on whether the long term bonds are included in the debt limit.
31. Budgetary loans and other cash flow borrowings.
The Task Force decided, and I agree, that budgetary loans and other cash flow borrowings of the State are specifically excluded from the debt limit by Section (3).
32. Certificates of participation sold by a trustee, evidencing interests in a payment obligation of the State or of a state agency.
The Task Force concluded that these certificates of participation or COPS may be included in the debt limit if the thing being purchased is immovable in nature.
It is my opinion that in order for the COPS to be included in the debt limit, there must be a debt obligation for which the State is legally obligated to make debt service payments and there must be a capital lease of an immovable included within the transaction. However, as previously explained, if the conditions of the preamble to Section 2 are not met, then the transaction cannot be included within the debt limit.
I acknowledge that this opinion is rather lengthy and has taken the Task Force and this office some time to carefully analyze and research. However, as you can see, the subject matter is very complex. I must additionally advise the Commission that this opinion in no way mandates the Commission to approve a debt issuance which, in my opinion, is or is not within the debt limit. The Commission is charged with reviewing and approving all bond issues of the State and its agencies, political subdivisions, public trusts and certain other public bodies. That mandate is not changed by the enactment of the State's debt limit law. When the Commission reviews a proposed bond issue, it must look to various aspects of the issue, including its inclusion or exclusion in the debt limit as one element of the analysis.
I strongly suggest that the legislature, at its next session enact legislation to cure the statutory defects, in order to adhere to the mandate of the voters, as set forth in the constitutional amendment. Although an amendment to the statute requires a two-thirds vote of each house of the legislature, as opposed to a majority vote, I believe that the problems in the legislation can be resolved by the legislature. It is not necessary to modify the constitutional amendment by presenting the issue to the voters at an election. If I or my staff can assist the legislature in any way in amending the statute, please feel free to contact me.
Yours very truly,
 Richard P. Ieyoub Attorney General